UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| TREVON HOLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-CV-01185 JD |
| | ) | |
| FOREST RIVER, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION AND ORDER**

Plaintiff Trevon Hollins filed this action alleging that he was discriminated and retaliated against by Forest River. From January 2018 to May 2019, Mr. Hollins worked at Forest River, primarily in its shipping department. Based on a handful of events that occurred shortly before his termination, Mr. Hollins filed a lawsuit, claiming that Forest River committed unlawful retaliation against him for engaging in activity protected under Title VII, including expressing his good faith belief that he was being subject to discrimination in the workplace on the basis of race. Mr. Hollins is claiming that he suffered damages including wage loss and loss of health insurance coverage for himself in addition to mental, emotional pain and suffering, humiliation, and anxiety. On January 21, 2021, Forest River moved for summary judgment on all claims asserted by Mr. Hollins. [DE 26]. Mr. Hollins moved to strike an affidavit and the after-acquired evidence defense asserted by Forest River in its motion for summary judgment. [DE 28]. A couple of weeks later, he then filed his response to the motion for summary judgment. [DE 32]. The Court addresses both motions, which are fully briefed, in this order. Evaluating the motion on the evidence before it, the Court concludes that Forest River is not entitled to summary judgment.

## I.  FACTUAL BACKGROUND

Trevon Hollins, an African American man, was hired by Forest River on January 4, 2018, to work in its shipping department, where he built crates and shipped parts at his worktable. [DE 27-3, Hollins Dep. at 98]. When Mr. Hollins first started at Forest River, work orders were supplied to him by a woman named Michelle in the plant's business office. Mr. Hollins would receive a stack of work orders every morning and complete the orders throughout the day. For each work order, Mr. Hollins was responsible for building the crate, gathering the ordered parts, labelling the shipment, and loading the crates onto the freight truck when it arrived at the plant. [*Id.*]. About six months after he started, Mr. Hollins was credited with doubling the shipping department's productivity. The Personnel Action Notice dated July 18, 2018, states, "The amount of items that are being sent since his transfer went up by 2x." [DE 32 at 6]. Mr. Hollins received a pay raise as a result of this commendation.

In November of 2018, Kenny Sellers became the dock manager of the shipping department. [DE 32-3, Sellers Dep. 7:9-25]. Mr. Sellers's boss was Lisa Goodwin, who was the Manager of Parts, Service, and Warranty at Forest River. Ms. Goodwin's office physically overlooked the shipping department where Mr. Hollins worked. [DE 32-4, Goodwin Dep. 4:18-19]. After Mr. Sellers started working as dock manager, tension developed between him and Mr. Hollins over the work orders Mr. Hollins used to complete his daily work. Mr. Hollins testified that Mr. Sellers was always aggressive when he requested more work orders and he prevented Mr. Hollins from getting them by claiming that he needed to review them. [DE 27-3, Hollins Dep. 143:9-25]. From Mr. Hollins' perspective, it seemed as though Mr. Sellers was withholding work from him and he did not understand why. This tension increased until an alleged incident occurred on April 10, 2019, between the two men. Mr. Hollins claims that Mr. Sellers called him a racial slur, the N-word, under his breath. [*Id*. at 147:19-148:21]. The men were again arguing

over work orders that Mr. Hollins wanted and Mr. Sellers refused to provide. According to Mr. Hollins, Mr. Sellers used the racial slur before walking back into his office. There were no other witnesses to this exchange.

Immediately following this incident, Mr. Hollins told his mother, Tobi Conroy, a previous employee of Forest River, about the racial slur and, on April 19, 2019, she filed an incident report with the company's compliance hotline. [DE 32-7; DE 27-8]. In the incident report, Ms. Conroy states the following:

> "My son Trevon Hollins has been being retaliated against, singled out, and called a [N-word]. Kenny Sellers called him a [N-word] while he was working on the dock. He walked up behind him and said it, so that nobody else could hear it . . . . My son is very fearful he will be treated even worse after this has been reported, even more so that he may be fired."

[*Id*.]. Ms. Conroy had also texted Curtis Gunter, Forest River Plant 3's General Manager about the incident. [DE 32-6]. As a result of the complaint, Compliance Officer David Youmans, asked Human Resources Manager, Angie Garza, to investigate the incident. [DE 32-7]. Ms. Garza testified that under Forest River's code of conduct, a member of management was required to investigate any reported incident of racial discrimination. [DE 32-2, Garza Dep. 7:8-21]. Notably, Ms. Garza testified that she met with Mr. Sellers regarding the incident, but Mr. Sellers testified that he did not hear about Mr. Hollins's accusation against him until after Mr. Hollins was terminated. [*Id*. at 13:9-25; DE 32-3, Sellers Dep. 19:20-20:8]. Ms. Garza also testified that she interviewed Mr. Hollins about the incident, but Mr. Hollins denies that she ever spoke to him about it prior to his termination. [DE 27-5, Garza Dep. 20:22-21:15; DE 27-3, Hollins Dep. 241:15-19].

About a week after the complaint was filed, on April 24, Mr. Sellers and Ms. Goodwin created a memorandum for all employees in the shipping department that included a list of tasks

that the workers should do if they had nothing else to do. [DE 32-1 at 3]. Mr. Sellers testified that he created the memorandum because he had several employees approaching him regarding Mr. Hollins sitting down on the job, taking elongated breaks when other work needed to be done, and blaming other people for work not being done. [DE 27-1, Sellers Dep. 32:10-24]. Mr. Sellers also testified that everyone in the shipping department had their own copy of the memo and everyone signed it. Ms. Goodwin had worked with Mr. Sellers in the creation of the memo and specifically stated that they had everyone in the department sign the memo in order to not single out Mr. Hollins. [DE 32-4, Goodwin Dep., 39:5-11]. Juan Ramirez, one of Mr. Hollins's co-workers on the dock, testified that the workers in the shipping department would take the same morning and lunch break. [DE 27-7, Ramirez Dep. 16-18]. He also testified that he met with Ms. Garza about Mr. Hollins sitting on a table reading a book, sitting around on the job, and taking extended lunch breaks. He also provided her with six different photographs he took of Mr. Hollins sitting on the job. [*Id*. at 26-30].

About two weeks after circulating the memo in the shipping department and after not seeing an improvement in Mr. Hollins's behavior at work, Mr. Sellers sent Ms. Goodwin an email entitled "problem employee." [DE 32-8]. In the email, Mr. Sellers requests a meeting with HR regarding a department issue and states the following:

> "Mark is beyond fed up, he (Tre[von]) is combative against Juan, and his attitude still is terrible. He affects the moral [sic] of the entire dock, he (someone he knows) has made multiple false claims against supervisors and even after we made a read and sign document for the dock to outline 'job descriptions' he continues to sit on his table or paneling and read or be on his phone, every day. Meanwhile every other employee is working in their section, asking what they can help with, or what they can do to stay busy . . . . He is our highest paid dock employee and he does the least. He comes in early, leaves late and does less than anyone."

[*Id*.]. After receiving this email from Mr. Sellers, Ms. Goodwin forwarded it to Ms. Garza and shared her perspective on Mr. Hollins. Notably, Ms. Goodwin indicated that she and Jeff

Cumberland met with Mr. Hollins on May 2 to let him know there were many complaints about his attitude. [DE 32-8]. In the meeting, Mr. Hollins explained to her that people on the dock always complained about how he looks and also that there were tasks on the shipping department memo that he felt like he should not be doing. [*Id.*]. Employees in the shipping department were also claiming that they had pictures and a reported video of Mr. Hollins sleeping at work. [DE 27-9]. In the email, Ms. Goodwin also explained to Ms. Garza that someone complained that Mr. Hollins was laying on his table on May 9, but that he told her he wasn't feeling well so she sent him home. She finished the email by stated the following, "Anyways . . . I wanted it noted. I'm not seeing him sleep, I'm not seeing him sit around. I do know, there's a lot of people that are getting highly agitated about the situation, but he doesn't see he is the problem, that it's everyone else." [DE 32-8]. Following this email, Ms. Garza agreed to meet with Ms. Goodwin in her office on May 15. [DE 32-10].

On May 15, while Ms. Garza was meeting with Ms. Goodwin, she observed Mr. Hollins continuing to sit around throughout the day. She took several photos of Mr. Hollins in his workspace not working. [DE 27-5 at 45-52]. Ms. Garza testified that Ms. Goodwin called her because Mr. Hollins had been sitting throughout the day and she wanted Ms. Garza to observe what he was doing. [DE 27-5, Garza Dep. 82:7-14]. Both Mr. Hollins and Ms. Garza testified that he waved to her while she was standing in the window of Ms. Goodwin's office. [*Id*. at 83:11-25; DE 32-1 at 4]. Ms. Garza also testified that she did not do any follow-up or fact-checking of Mr. Sellers's "problem employee" email since she didn't have time to and since she personally witnessed him not working when he was supposed to. [DE 32-2, Garza Dep. 65:1-14].

On May 17, 2019, Ms. Garza, Lynn Miller, and Ms. Goodwin met with Mr. Hollins and told him that he was terminated from his position at Forest River. Ms. Garza told Mr. Hollins,

"Obviously you seen [sic] me the other day when I was here, we've had several, several complaints concerning you're not doing your job, sitting around. So obviously I stood at the window here for a good twenty minutes watching you do absolutely nothing." [DE 27-9]. Ms. Goodwin then explained to Mr. Hollins that since he was previously told he needed to always be working and he had refused to do so, that his actions were considered insubordination and due to the multiple complaints received about him from others in the department, they had to let him go. [*Id*.]. After being terminated, Mr. Hollins gathered his things and left Forest River.

## II.  STANDARD OF REVIEW

Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). The non-moving party cannot simply rest on its pleadings but must present evidence sufficient to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322– 23 (1986).

6

### III.  DISCUSSION

Since Mr. Hollins's Complaint does not have specific headers identifying individual claims or counts, Forest River addressed several arguments in its motion for summary judgment including ones for hostile work environment and racial discrimination. In his response brief, Mr. Hollins states that he did not assert those claims and only addresses the retaliation claim. [DE 32 at 2 n.3]. Since Mr. Hollins stated that he is not asserting these claims, the Court views them as waived and will only address his claim for retaliation under Title VII.[1] The Court will also address the parties' arguments on the motion to strike.

### A.      Mr. Hollins's Claim of Retaliation under Title VII

Title VII prohibits employers from discriminating on the basis of race, 42 U.S.C. § 2000e–2(a)(1), as well as retaliating against employees who engage in protected activities, such as reporting or opposing unlawful employer behavior. § 2000e–3(a). "To sustain a retaliation claim, Vesey must show that (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse action." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021).

In employment discrimination and retaliation cases, the Seventh Circuit abolished the distinction between "direct" and "indirect" evidence of discrimination and retaliation. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (applying *Ortiz* to retaliation claims). "[I]nstead [courts are directed to] consider all of the record evidence to determine whether a causal link exists." *Lauth*, 863 F.3d at 716. The Court recognizes that under either method, the question is the same: "could

---

[1] "The parties—not the courts—must research and construct available legal arguments." *United States v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015) (citing *Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado*, 771 F.3d 980, 987 (7th Cir. 2014)). Further, "'perfunctory and undeveloped' arguments are deemed waived." *Id.*; *see also United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

a reasonable trier of fact infer retaliation?" *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). And here, the Court finds that a reasonable trier of fact could infer retaliation and, therefore, denies Forest River's motion for summary judgment.

### 1.  Analyzing the Evidence under *Ortiz*

Mr. Hollins must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *See Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). Mr. Hollins clearly engaged in a protected activity when he filed a complaint with Forest River alleging racial discrimination. Moreover, he suffered a materially adverse action in the form of termination from his position at Forest River. *See Burks v. Wisconsin,* 464 F.3d 744, 758 (7th Cir. 2006) (noting that "termination is certainly an adverse action"). Thus, the only element at issue is whether there is a causal connection between him making a complaint of racial discrimination and his termination from Forest River.

Mr. Hollins has not put forth any direct evidence of a causal link between his complaint of racial discrimination, the complaints of his performance on the job, and his ultimate termination. Notably though, because direct evidence "essentially requires an admission by the employer," such evidence "is rare." *Benders v. Bellows & Bellows,* 515 F.3d 757, 764 (7th Cir. 2008) (citing *Mannie v. Potter,* 394 F.3d 977, 983 (7th Cir. 2005)). But a plaintiff may also demonstrate the causal link by pointing to circumstantial evidence, which can include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Hobgood v. Illinois Gaming Bd.*,

731 F.3d 635, 643–44 (7th Cir. 2013). These categories are not exclusive and are not prongs of a circumstantial test. *See id*.

Here, Mr. Hollins points to several sources of circumstantial evidence to support the causal connection between his complaint of racial discrimination and his termination including his personnel file with Forest River, Ms. Garza's decision to only investigate Mr. Hollins's possible work deficiencies and not the incident of racial discrimination, and the suspicious timing between his complaint and his termination. The Court reviews each piece of evidence.

a) *Mr. Hollins's Personnel File at Forest River*

First, Mr. Hollins points to his personnel file with Forest River as circumstantial evidence supporting his claim. He received one very favorable assessment in 2018, which included a pay raise, for efficient and fast work. Notably, Mr. Hollins did not receive any negative assessments or write-ups until his termination. Both Ms. Goodwin and Ms. Garza testified that he had zero negative assessments or write-ups in his file. [DE 32-2, Garza Dep. 49:1-24; DE 32-4, Goodwin Dep. 17:11-18:5]. Moreover, Ms. Goodwin's email to Ms. Garza regarding Mr. Hollins's work on the dock specifically noted that she was not seeing him sit or lay around at work, even though there were rumors of such activity. Forest River demonstrates some evidence of Mr. Hollins's co-workers being unhappy with his work ethic on the dock, but if there were clearly so many performance issues with Mr. Hollins's work, it is not clear to the Court why he would not have had more write-ups or negative assessments in his personnel file. Moreover, if Mr. Hollins was such a poor performer, then why was he not fired earlier? *See Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 905 (7th Cir. 2006). While this piece of circumstantial evidence is not enough to establish Mr. Hollins's case, it certainly is one piece of evidence that the Court finds to weigh in his favor.

9

  b)  *The Timing Between the Complaint of Racial Discrimination and Termination*

Like Mr. Hollins's personnel file, the Court finds timing to be another piece of circumstantial evidence that helps Mr. Hollins's case. While this Court recognizes that the Seventh Circuit has warned that "[a] close temporal connection between the protected act and the adverse employment action, without more, is insufficient to support an inference of causation," it is still a piece of evidence to be considered. *Turner v. The Saloon, Inc.,* 595 F.3d 679, 687 (7th Cir. 2010); see also, *Malin v. Hospira, Inc.*, 762 F.3d 552, 554 (7th Cir. 2014) (rejecting the idea that the passage of a particular amount of time between protected activity and retaliation can bar the claim as a matter of law). From beginning to end, the major occurrences in this case happened within an almost one-month period of time. And while Forest River emphasizes that four weeks passed between the complaint of racial discrimination and Mr. Hollins's termination, the Court finds that there were several events in between that connect the two.

On April 10, 2019, Mr. Hollins called his mother Tobi Conroy, a previous employee of Forest River to complain about Mr. Sellers calling him the N-word on the dock that day. On the same day, Ms. Conroy sent several text messages to Plant Manager, Curtis Gunter, complaining about the treatment of Mr. Hollins on the dock. The texts to Mr. Gunter implored him to get involved and to protect her son. [DE 32-6; DE 27-4 at 22-29]. Mr. Hollins decided, along with his mother, that she would file a complaint with Forest River's hotline because he did not want any repercussions for making the complaint. [DE 27-3, Hollins Dep. 157:10-21]. Ms. Conroy filed the complaint on April 19. That very day HR compliance manager, Mr. Youmans, contacted Ms. Conroy to discuss the incident and he also asked Ms. Garza to investigate the incident for Forest River. On April 22, Mr. Youmans contacted Mr. Hollins about his complaint, although Mr. Hollins refused to give him any details. [*Id*. at 213:4-214:13]. Since Mr. Hollins

10

refused to give Mr. Youmans any additional information, the investigation into the incident was formally closed on April 23.[2] On April 24, Mr. Sellers and Ms. Goodwin testified that they created and circulated a memorandum of work expectations for employees on the dock. They specifically gave it to everyone in order to not target Mr. Hollins. On May 2, Ms. Goodwin met with Mr. Hollins to discuss the work duties detailed in the memo and he communicated to her that he did not think some of them were appropriate, although Mr. Hollins disputes that happened. [DE 27-9; DE 32-1]. On May 10, Mr. Sellers sent an email titled "problem employee" to Ms. Goodwin requesting a meeting with HR about Mr. Hollins's work performance on the dock. On May 13, Ms. Goodwin emailed Ms. Garza about Mr. Hollins's work performance on the dock and seemed to explain away some of the complaints made about him. On May 16, Ms. Garza visited the dock in person and observed Mr. Hollins not working for a certain period of time. [DE 32-2, Garza Dep. 65:6-66:15]. On May 17, Ms. Garza, Ms. Goodwin, and Lyn Miller terminated Mr. Hollins from his position at Forest River.

Mr. Hollins claims that the timing of his firing constitutes circumstantial evidence that supports a finding of the requisite causal connection and the Court agrees. As the previous section demonstrates, while four weeks did pass between the complaint of racial discrimination and Mr. Hollins's termination, something was happening on Forest River's end almost every single week in between. While Ms. Goodwin and Mr. Sellers testified that employees were

---

[2] Mr. Youmans contacted Ms. Conroy electronically through the ethics hotline and stated:

> "You did not provide the documents, as you promised to do, that would assist in the investigation. Therefore, we had to conduct investigation without the benefit of that evidence which you withheld. The investigation did not reveal evidence that supports your claims. I ask that you encourage Trevon to immediately report any mistreatment or discriminatory behavior. He can report this to any member of his chain of command in management, HR or through this hotline. We are committed to providing a workplace free of illegal discrimination."

[DE 27-8 at 2].

complaining about Mr. Hollins on the dock already, the closeness in time between the complaint of racial discrimination, the creation of their memo, and the investigation into Mr. Hollins's work performance is suspicious. *E.g.*, *Lang v. Ill. Dep't of Children & Family Servs.,* 361 F.3d 416, 420 (7th Cir.2004) (noting that timing of employer's discipline of plaintiff was "extremely suspicious" where employer had never criticized his performance during previous five years of employment but began to issue frequent written criticisms within a month of the time that plaintiff complained of discrimination). "Occasionally, [where] an adverse action comes so close on the heels of a protected act [] an inference of causation is sensible." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). And importantly, the Seventh Circuit has cautioned that "[a] jury, not a judge, should decide whether the inference is appropriate." *Id.* Thus, the Court finds this is another piece of circumstantial evidence that fits into Mr. Hollins's theory of causation.

c)  *Ms. Garza's Investigation of the Complaint*

Mr. Hollins also argues the trier of fact could reasonably conclude that Ms. Garza made a decision to not investigate the complaint of racial discrimination but instead that her priority from the outset was to find a reason to terminate Mr. Hollins from his position. It is undisputed that Ms. Garza was asked to investigate the incident that occurred between Mr. Sellers and Mr. Hollins, but there is contradictory evidence that she did in fact investigate it. In her deposition, Ms. Garza testified that she questioned Mr. Sellers about the incident in Ms. Goodwin's office and told him that if he did use that kind of language, it needed to stop. [DE 32-2, Garza Dep. 13:5-14:9]. Ms. Garza stated that Mr. Sellers took offense at the accusation and stated that he had African American relatives. [*Id*. at 20:13-21]. Interestingly, both Mr. Sellers and Ms. Goodwin denied this ever happened. [DE 32-3, Sellers Dep. 19:20-20:19; DE 32-4, Goodwin Dep. 15:2-

14]. Mr. Sellers also testified that he does not have any African American family members. [DE 32-3, Sellers Dep. 44:4-16]. Additionally, Mr. Hollins testified that he never spoke with Ms. Garza prior to the day of his termination and that she never talked to him about the incident. [DE 27-3, Hollins Dep. 241:15-242:16].

The Court finds this testimony to be another piece of circumstantial evidence that supports Mr. Hollins. Clearly, there are issues of material fact in dispute as to whether Ms. Garza, the Human Resources representative of Forest River, actually investigated Mr. Hollins's complaint. Moreover, Ms. Garza was directly involved in investigating Mr. Hollins for work performance issues less than a month after he made the complaint and the investigation was specifically requested by the person Mr. Hollins made a complaint about—Mr. Sellers. Notably, in his email to Ms. Goodwin about the "problem employee," he specifically states that "[Mr. Hollins] (someone he knows) has made multiple false claims against supervisors," which can be read to mean that Mr. Hollins's mother made false claims about supervisors. [DE 32-8]. In his deposition, Mr. Sellers was not clear on the timeframe of when he learned about Mr. Hollins's allegations against him, but an inference could be made from his email that he was aware of the complaint before sending the "problem employee" email to Ms. Goodwin. Finally, Mr. Hollins testified that there was tension between him and Mr. Sellers over the work orders that Mr. Hollins felt were withheld from him. He testified that the two of them had previously gotten into a fight even before the incident of racial discrimination. [DE 27-3, Hollins Dep. 190:1-15].

Ms. Garza's investigation into the complaint of racial discrimination was extremely limited and she had only one note in a notebook without a date to corroborate that she did, in fact, interview any witnesses about it. But none of the witnesses she said she interviewed remembered meeting with her about it. "In a typical sham investigation, persons conducting the

investigation fabricate, ignore, or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome (for instance, by deliberately failing to interview certain witnesses)." *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015). Without concluding that the investigation was a sham, the Court finds there to be enough circumstantial evidence to support such an inference and that it is an issue for the jury to decide. Moreover, credibility determinations must be made by the trier of fact at trial and not by the judge at this stage in the litigation. Thus, the Court finds the details surrounding Ms. Garza's investigation of the complaint of racial discrimination or lack thereof also add to the circumstantial evidence supporting a causal connection between the complaint and Mr. Hollins's termination.

    *d)* *Pretextual Reason for Termination*

Finally, the Court finds there are genuine issues of material fact surrounding Forest River's proffered nondiscriminatory reason for firing Mr. Hollins. Factual disputes abound with respect to whether Mr. Hollins had significant performance problems and was acting insubordinate on the job. Forest River argues that Mr. Hollins's refusal to follow Ms. Goodwin's instructions breaks any inference of causation because he flouted her directives and he was observed sitting on a table while his colleagues worked. Mr. Hollins openly admitted in his deposition that he did not take set break times and that he did lounge around on the job, but he also asserted that everyone else on the dock did the same thing. [DE 27-3, Hollins Dep. 244:6-10; DE 32-1 at 2-3]. "[A]n employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation." *Lang,* 361 F.3d at 419–21. Summary judgment should be granted only if the defendant "presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive." *Stone v. City of Indianapolis*

*Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). The Seventh Circuit has also found that selective enforcement or investigation can be evidence of pretext and that "evidence of selective enforcement of a rule calls into question the veracity of the employer's explanation." *Coleman v. Donahoe,* 667 F.3d 835, 857 (7th Cir. 2012) (internal quotation marks omitted); *Harden*, 799 F.3d at 864.

Here, the evidence taken in the light most favorable to Mr. Hollins, creates a triable issue of pretext as to whether Forest River "honestly believed" the proffered reason of insubordination as the reason for his termination. Unlike Ms. Garza's investigation into Mr. Hollins's complaint of racial discrimination, her investigation of Mr. Sellers's complaints of Mr. Hollins's work performance was more thorough and involved her physical presence on site. Ms. Garza questioned Mr. Sellers but only to address Mr. Hollins' work ethic and never followed up with Mr. Hollins to fact-check Mr. Sellers' statements. [Sellers Dep. 26:19-27:14; Garza Dep. 59:6-16; 60:3-61:22]. Following Mr. Sellers's "problem employee" email, which Ms. Goodwin forwarded to Ms. Garza, Ms. Goodwin specifically stated in her email that she had not seen a video of Mr. Hollins sleeping on the job despite asking other employees about it, she was not seeing him sleep on the job, and had not seen him sitting around. [DE 32-9]. Ms. Garza testified that she did not have time to fact-check Mr. Sellers's email to see if it was truthful or accurate because they ended up terminating Mr. Hollins for sitting on his table doing nothing during work hours. [DE 32-2, Garza Dep. 59:21-60:6]. She testified that she observed Mr. Hollins sitting down while his co-workers were working and it was not break-time. [*Id*. at 65:6-21]. Mr. Hollins disputes this testimony and explained that she photographed him during a break and that his co-workers had started coming back from break towards the end of her observation time. [DE 32-1 at 4]. Forest River points to the memo as the main directive that Mr. Hollins did not follow in the

shipping department, but the Court notes that the memo or task list contains no break times or directs that an employee must be constantly working. [DE 32-4 at 14-15]. The memo reads more as encouraging employees to work together and to maintain a clean workspace. It does not include any specifically labelled "work requirements" for any job on the dock.

Finally, there were inconsistencies among the Forest River supervisors as to who actually made the decision to terminate Mr. Hollins. Ms. Garza testified that they specifically waited to make the termination until Mr. Gunter could weigh in and she stated that he recommended termination. [DE 32-2, Garza Dep. 78:1-22]. She also stated that the decision to fire Mr. Hollins was made by Ms. Goodwin and Mr. Gunter together. [*Id*. at 80:14-17]. In his deposition, Mr. Gunter stated that it was not his decision and that it was Lisa Goodwin's decision to terminate him. [DE 27-10, Gunter Dep. 16:8-12]. In Ms. Goodwin's deposition, she testified that it was her, Ms. Garza's, and Mr. Gunter's decision to fire Mr. Hollins. [DE 27-6, Goodwin Dep. 24:1-7]. Ms. Goodwin testified that she felt Ms. Hollins should be terminated because he was not doing his job most of the time and because he had a bad attitude. [*Id*. at 31:3-9]. Although notably four days prior to his termination she sent an email to Ms. Garza stated that she was not seeing him sit or sleep on the job and seemed to defend some of his recent behavior. And finally, in the answers to the interrogatory questions, Forest River identified Ms. Garza and Ms. Goodwin as being the decision-makers. [DE 32-11].

The Court finds that these ambiguous and inconsistent statements surrounding Mr. Hollins's termination supply additional circumstantial evidence of causation. Ms. Garza was inconsistent in her investigation of the complaints made on the dock, the memo includes ambiguous directions to be helpful, there were inconsistencies in how problematic Mr. Hollins's work ethic was on the dock as described by different employees at Forest River, and there were

even inconsistencies in who made the ultimate decision to terminate him. The jury could find these and similar pieces of evidence significant because "flagrant inaccuracies and inconsistencies in the employer's supposed reason" for firing the plaintiff can be evidence of pretext. *Harden*, 799 F.3d at 866. And the jury could also find Forest River's lack of interest in Mr. Hollins's side of the story to be significant. As Mr. Hollins has presented the evidence, the jury could agree that the investigation into his work performance was a determined effort to build a case against him instead of a neutral effort to discover the truth. *See Vega v. Chicago Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020).

The ultimate issue that must be decided is whether Forest River fired Mr. Hollins because it honestly believed the allegations about his job performance had merit or because he was complaining about his discriminatory treatment on the dock. At this juncture, it is the Court's duty to examine the evidence as a whole, including any circumstantial evidence, draw all reasonable inferences in favor of Mr. Hollins, and determine whether a reasonable jury could find that Mr. Hollins was fired for submitting a complaint about racial discrimination. *Hobgood*, 731 F.3d at 644. Here, Mr. Hollins has supplied enough evidence that Forest River offered a pretextual reason for his termination. He "has presented sufficient evidence from which a finder of fact could genuinely call into question [Forest River's] honesty." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018). And "[b]ecause a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment." *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002).

Forest River argues that Mr. Hollins has failed to present evidence of a causal connection because he was failing to meet work performance expectations. Forest River contends that these

criticisms of his work performance were rooted in observations by Mr. Sellers, Ms. Garza, and other employees on the dock. "Evidence, though not conclusive, that the cause was retaliation should be enough to entitle the plaintiff to a jury trial unless the defendant can produce uncontradicted evidence that he would have [taken the adverse action against the] plaintiff anyway." *Stone,* 281 F.3d at 643. Viewing the facts in the light most favorable to Mr. Hollins, he has demonstrated that a reasonable jury could conclude that there is sufficient evidence indicating unlawful retaliation, including the lack of negative performance reviews in his personnel file, the short time period between the complaint and his firing, the investigation by Ms. Garza into Mr. Hollins's job performance following Mr. Sellers's email, the inconsistent statements made by Forest River supervisors regarding who made the final termination decision, and the fact that the individuals involved in the decision to fire Mr. Hollins were also involved in the investigation of his discrimination allegations. Here, Mr. Hollins has successfully cast doubt on Forest River's explanation for his termination.

Summary judgment is appropriate only if a reasonable fact finder would be compelled to believe Forest River's explanation, *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997), and Mr. Hollins can avoid summary judgment by pointing to specific facts that place the employer's explanation in doubt. *Zaccagnini v. Chas. Levy Circulating Co.,* 338 F.3d 672, 676 (7th Cir. 2003). We conclude here that the evidence, taken in the light most favorable to Mr. Hollins, creates a triable issue of fact as to the reason why he was fired. In the end, the jury may not credit Mr. Hollins's evidence and could accept Forest River's explanations, but given the conflict on material issues, a trial is necessary here. Therefore, Forest River's motion for summary judgment on Mr. Hollin's retaliation claim is denied.

### 2.  Cat's Paw Theory of Liability

While the Court has already determined that Mr. Hollins's retaliation claim advances, it will briefly address the Cat's Paw argument made as well. The cat's paw theory of liability applies when a biased supervisor "who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Vesey*, 999 F.3d at 462. Under this theory of liability, Mr. Hollins must show that the biased supervisor's actions were a proximate cause of the adverse employment action. *See Staub v. Proctor Hospital, Inc.*, 562 U.S. 411, 421 (2011). Proximate cause exists only if the investigation took the complaint "into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified" or if the investigation "relies on facts provided by the biased supervisor." *Id*. at 421. "With sufficient evidence, [courts] permit juries to draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011).

Here, Mr. Hollins argues that Ms. Garza was influenced by Mr. Sellers to terminate him. He asserts that Ms. Garza only interviewed Mr. Sellers about his complaints of Mr. Hollins's job performance but not Mr. Hollins. Ms. Garza also asserted that she had no time to fact-check Mr. Sellers's complaints since she carried out her own investigation and determined that Mr. Hollins should be terminated. "Under any formulation of the cat's paw standard, the chain of causation can be broken if the unbiased decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Schandelmeier-Bartels*, 634 F.3d at 383. Here, however, as discussed earlier, Mr. Hollins presented ample evidence from which a jury could conclude that Ms. Garza's investigation into his job performance was not

independent of Mr. Sellers's input. The Court would also note that in its answers to the interrogatories, Forest River indicated that Mr. Sellers had input in the decision to terminate Mr. Hollins's employment. [DE 32-11; DE 32-12]. Thus, there is enough here for a jury to consider Mr. Hollins's retaliation claim under a cat's paw theory of liability.

### B.    Damages and the After-Acquired Evidence Defense

The final issue presented in Forest River's motion for summary judgment is, assuming that any of Mr. Hollins's claims were to survive summary judgment, whether after-acquired evidence bars his damages. [DE 27 at 23]. Under this defense, after-acquired evidence of an employee's misconduct may limit damages. *See McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 361–362 (1995). "An employer may be found liable for employment discrimination, but if the employer later—typically in discovery—turns up evidence of employee wrongdoing which would have led to the employee's discharge, then the employee's right to back pay is limited to the period before the discovery of this after-acquired evidence." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047 (7th Cir. 1999); *see also Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005). Forest River asserts that Mr. Hollins lied multiple times on his application for employment including that he had been fired twice. Thus, Forest River now seeks to limit Mr. Hollins's available damages. In response, Mr. Hollins moved to strike both the defense of after-acquired evidence and three paragraphs of the affidavit of Dale Huyvaert which supported it. [DE 28]. The Court will first address whether Mr. Hollins was prejudiced by Forest River's delay in asserting the defense and then it will address whether the claim proceeds at this stage.

### 1.   Mr. Hollins was Prejudiced by Forest River's Delay in Raising this Defense

Generally, a failure to plead an affirmative defense results in a waiver of that defense. "But when parties argue an affirmative defense in the district court, technical failure to plead the

defense is not fatal." *Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 928 (7th Cir. 1991). The

Seventh Circuit has stated that it "will generally find that the failure to plead an affirmative

defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay

in asserting it." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478 (7th Cir. 2019) (quotation

omitted). In reviewing whether a district court may allow the affirmative defense, the Seventh

Circuit has identified several factors for it to consider including whether there is an explanation

for raising the defense so late, whether the defense depends on facts within the knowledge and

control of the defendant itself, and whether the defense was deployed after discovery closed. *Id*.

at 482. "A district court may, however, exercise its discretion to allow a late affirmative defense

if the plaintiff does not suffer prejudice from the delay." *Burton v. Ghosh*, 961 F.3d 960, 965 (7th

Cir. 2020).

First, the Court finds that Mr. Hollins was unduly prejudiced by Forest River's delay in

raising this defense. While the Court notes that this information did not come to light until Mr.

Hollins's deposition in September 2020 as Forest River asserts, the discovery deadline was

extended beyond its scheduled deadline two times. While Forest River argues that discovery was

extended each time for a limited purpose as indicated by the magistrate judge's order, it still had

sufficient time to alert Mr. Hollins regarding the defense it was planning to raise. "Once the

availability of an affirmative defense is reasonably apparent, the defendant must alert the parties

and the court to his intent to pursue that defense." *Venters*, 123 F.3d at 967. Forest River learned

of the omissions on Mr. Hollins's job application in September but did not raise the defense until

January in its motion for summary judgment. Alerting Mr. Hollins to the defense would have

allowed him to complete discovery on the issue as it primarily depends on facts and knowledge

within the control of Forest River. Thus, Mr. Hollins "was prejudiced by the delay in raising the

21

defense." *Burton*, 961 F.3d at 970 (noting how asserting a defense in a motion to dismiss was a procedural tactic that gave the defendants the benefit of an amended pleading without having to address whether the amendment was appropriate thereby forcing the plaintiff to address both the procedural issue and the substantive defense).

While both parties were present when Mr. Hollins admitted to omitting the required information on his job application as Forest River points out, this issue came up briefly in only one deposition, which cannot be reasonably treated as fair notice that Forest River "would actually assert the defense and that the plaintiff would need to spend the time and money needed to meet that defense." *Reed*, 915 F.3d at 482. As the Seventh Circuit recognized in both *Reed* and *Venters*, this Court "cannot overlook the failure to comply with Rule 8(c) in this context. Intentionally or not, [Mr. Hollins] was bushwacked." *Id.*; *Venters*, 123 F.3d at 969. Since the defense depends on why Forest River terminates its employees at least as related to omissions made on their job applications, the Court recognizes that Mr. Hollins needs additional time to seek information on this very limited issue.

As a result of this prejudice, the Court grants Mr. Hollins the opportunity to seek discovery on other employees at Forest River who were terminated for similar omissions on their job applications. More specifically, Forest River asserts that Mr. Hollins lied multiple times on his job application regarding his prior employment, including that he had been fired twice and omitting the details of his prior employment with Forest River. [DE 27 at 23]. As Mr. Hollins argues in his motion to strike, his omissions were related to jobs held in high school. Perhaps Forest River is equally hard on other employees for the lack of details from their high school work records, but there is insufficient evidence in the record on that point. Allowing additional discovery on this issue will reduce the harm to Mr. Hollins and allow both parties to be better

prepared for trial. As a result, the Court finds that Mr. Hollins's motion to strike the after-acquired evidence defense and the three contested paragraphs in the supporting affidavit of Dale Huyvaert is now moot. [DE 27-2].

### 2.   Forest River's Motion for Summary Judgment as to the Defense is Denied

The Court will also address Forest River's motion for summary judgment on this claim. The employer bears the burden of persuasion by a preponderance of the evidence that the after-acquired evidence would have led to the employee's termination. *Sheehan¸* 173 F.3d at 1047–48. But this inquiry "focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not." *Id.* at 1048 (quoting *O'Day v. McDonnell Douglas Helicopter Corp.*, 79 F.3d 756, 759 (9th Cir. 1996)). Forest River must instead demonstrate that it had an actual employment practice of firing workers with analogous situations to Mr. Hollins. *See Roadway Exp., Inc. v. U.S. Dep't of Lab.*, 612 F.3d 660, 666 (7th Cir. 2010).

Thus, the Court finds there to be a genuine issue of material fact as to whether Forest River actually employs the practices described in their standards and policies. While Forest River filed Mr. Huyvaert's declaration in support of its after-acquired evidence defense, the Court finds it is insufficient to support the granting of its motion for summary judgment on the damages claim. Mr. Huyvaert stated that employee dishonesty is grounds for termination of an employee's employment and that Forest River had a practice of terminating employees for providing false information regarding prior employment. [DE 27-2]. He also stated that Forest River would have terminated Mr. Hollins's employment had it known he lied regarding his prior employment and the circumstances of his discharge. [*Id.*]. While the Court does not doubt Forest River had these

policies in effect at the time of Mr. Hollins's employment, Forest River has supplied no evidence that it actually employs this practice with its employees other than a self-serving statement from a single Human Resources manager that they do. Thus, allowing limited discovery on these issues will allow this argument to be fully addressed by both parties.

Therefore, the Court will allow limited additional discovery on this matter to cure the prejudice suffered by Mr. Hollins and will also deny the motion for summary judgment on this claim at this time.

## IV.  CONCLUSION

For those reasons, the Court DENIES Forest River's motion for summary judgment [DE 26] and the motion to strike is MOOT. [DE 28].

SO ORDERED.

ENTERED:  August 13, 2021

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court